[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11867

_____

D.C. Docket No. 1:10-cr-00521-TCB-AJB-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARK TOMLINSON,
a.k.a. Supa,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 3, 2017)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and JOSE MARTINEZ,[*] District Judge.

PER CURIAM:

Appellant Mark Tomlinson challenges his conviction for conspiracy to possess a controlled substance with the intent to distribute it. The Fourth Superseding Indictment in the case charged Tomlinson and others in ten counts. Tomlinson, however, was charged in only two of the counts: (1) in Count 1, Tomlinson was charged with conspiracy to possess with the intent to distribute MDMA, BZP, and marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C), and 841(b)(1)(D); and (2) in Count 9, Tomlinson was charged with possession with intent to distribute at least 500 grams of cocaine, BZP, and MDMA, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C) and 18 U.S.C. § 2. Tomlinson was tried separately from the other defendants in a four-day jury trial. The jury convicted Tomlinson on Count 1 but acquitted him on Count 9.

Tomlinson raises four issues on appeal: (1) whether sufficient evidence supported his conviction; (2) whether a fatal variance occurred between the single conspiracy charged in the indictment and the evidence presented at trial; (3)

---

[*] The Honorable José Martínez, United States District Judge for the Southern District of Florida, sitting by designation.

2

whether the district court abused its discretion in declining to give the jury Tomlinson's requested multiple-conspiracies instruction; and (4) whether the district court erred admitting evidence about Tomlinson's proffer interview.  We have carefully reviewed the record and the parties' briefs, and we have heard oral argument.   Because we find no reversible error, we now affirm Tomlinson's conviction.

First, we find that the evidence presented at trial more than sufficiently supported the guilty verdict on the conspiracy count.  We review *de novo* whether the record contains sufficient evidence to support a jury's verdict.  *United States v. Harris,* 20 F.3d 445, 452 (11th Cir. 1994).  In doing so, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor.  *Id*.  The jury's verdict must stand if substantial evidence supports it—that is, "unless no trier of fact could have found guilt beyond a reasonable doubt."  *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997) (citing *United States v. Battle,* 892 F.2d 992, 998 (11th Cir. 1990)).

Here, the evidence against Tomlinson was substantial.  During Tomlinson's trial, the government presented evidence regarding Tomlinson's involvement in drug-trafficking activities from as early as 2007 and continuing until his arrest in 2010.   Most of this evidence was based on the government's review and

3

presentation of evidence from more than 35,000 wiretapped phone calls, during which the government determined four major premises about Tomlinson and the drug-trafficking organization with which he was involved in the Atlanta metropolitan area: (1) that Jerome Bushay was the "cell head" of the Atlanta drug-trafficking organization, that Bushay was a drug supplier, and that Bushay directed others in the distribution of drugs; (2) that Otis Henry was also a drug supplier and that he was the equivalent of a "senior vice president" in the drug-trafficking organization; (3) that Tomlinson worked cooperatively with Bushay and others in the drug-trafficking organization, and that Bushay directed Tomlinson to do certain drug-related tasks; and (4) that Conrad Harvey was the stash-house guard and a lower-level member of the drug-trafficking organization.

In support of these allegations, the government organized its central evidence against Tomlinson around four specific episodes: the 2007 seizure of $63,000 from Tomlinson at the Canadian border; the April 2010 seizure of $102,000 from Ruth Hargreaves after she met with Tomlinson in the driveway of a house that he owned; Tomlinson's actions following the Drug Enforcement Administration's ("DEA") October 2010 seizure of over 700,000 pills from Henry's house; and the seizure of drugs at Harvey's "stash house," which Tomlinson also owned. The government also presented evidence comparing Tomlinson's nominal declared income to his extensive real and personal property,

to show that Tomlinson must have been making money from the drug business since his legal businesses did not explain his extensive assets.  Our review of the record yields the conclusion that the evidence amply supports Tomlinson's conviction for conspiracy to possess with intent to distribute controlled substances.

Second, no variance occurred between the conspiracy count in the indictment and the evidence presented at trial.  "A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." *United States v. Moore*, 525 F.3d 1033, 1042 (11th Cir. 2008) (citation and internal quotation marks omitted).  In determining whether the evidence presented a single conspiracy at trial, courts consider: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants."  *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008) (citation and internal quotation marks omitted).  But we "will not reverse a conviction 'because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is [1] material *and* [2] substantially prejudiced the defendant[ ].'"  *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (quoting *United States v. Alred*, 144 F.3d 1405, 1414 (11th Cir. 1998)).

Our close review of the record reveals no material variance between the evidence presented at trial and the conspiracy as charged in the indictment.

5

Tomlinson argues that the evidence supports the existence of only multiple conspiracies, not a single conspiracy, and that Tomlinson's role was limited to individually "helping" his friends avoid getting caught for their drug-trafficking activities. But we find that the evidence supports the jury's determination that a single drug-trafficking conspiracy existed and that Tomlinson played an active and important role in it.

And even if a material variance occurred—which, to be clear, we easily conclude that it did not—Tomlinson has failed to show that it resulted in "substantial prejudice." Indeed, Tomlinson presents no argument to support a finding that Tomlinson suffered substantial prejudice as the result of an alleged material variance. Instead, he conclusorily asserts in a single sentence that he "can establish prejudice, because the government effectively transferred guilt to him vis-à-vis the 'alleged' versus 'actual' conspiracies" involved in the April 2010 and October 2010 events.

This argument, without any support, cannot demonstrate substantial prejudice, particularly on this record. Here, Tomlinson was tried alone, in a single-defendant trial. *See Edouard*, 485 F.3d at 1348 (relying in part on the fact that the defendant was tried alone to conclude that the defendant suffered no substantial prejudice even if a material variance between the indictment and the evidence had occurred regarding single versus multiple conspiracies). Tomlinson was also

named in only two counts of the operative indictment, and the evidence at trial focused on Tomlinson's specific role in the conspiracy.  In addition, the district court instructed the jury to focus on only Tomlinson in reaching its decision, cautioning that Tomlinson was "on trial only for the specific crimes charged in the indictment" and that the jury was "here to determine from the evidence in this case whether [Tomlinson] is guilty or not guilty of those specific crimes."  We presume that the jury follows the court's instructions.  *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005).  Finally, the split verdict likewise demonstrates that the "jurors were able to compartmentalize the evidence presented" to them in this case.  *United States v. Holt*, 777 F.3d 1234, 1264 (11th Cir. 2015).

Third, the district court did not abuse its discretion when it declined to give the jury the multiple-conspiracies instruction that Tomlinson requested.  A multiple-conspiracies instruction is warranted "when the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates a jury could reasonably conclude that some of the defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment."  *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999).  Tomlinson argues that a multiple-conspiracies instruction was necessary in his case because, "based on the evidence at trial, a reasonable jury could find that there

7

were multiple conspiracies proved and not just the single conspiracy charged in the indictment."

We disagree.  First, as we have already explained, the evidence presented at trial does not support Tomlinson's multiple-conspiracies theory.  Second, the subject matter of the alleged multiple conspiracies was substantially covered by the single-conspiracy charge the district court gave the jury.  And third, Tomlinson was tried alone, minimizing the risk that he would be unfairly swept up in the evidence of others' involvement in the charged conspiracy.  We have previously noted that we are unaware of any case in this circuit concluding that a district court committed reversible error by declining to deliver the multiple-conspiracies instruction in a single-defendant trial.  *See Richardson*, 532 F.3d at 1291.  That remains true.

Finally, we find no error in the district court's admission of evidence about Tomlinson's proffer meeting.  The government's letter setting forth the terms of the proffer session provided, in relevant part, as follows:

> If [Tomlinson] subsequently takes a position in any legal proceeding that is inconsistent with the proffer—whether in pleadings, oral argument, witness testimony, documentary evidence, questioning of witnesses, or any other manner—the Government may use your client's proffer statements, and all evidence obtained directly or indirectly therefrom in any responsive pleading and argument, and for cross-examination, impeachment, or rebuttal evidence.

8

During his proffer session, Tomlinson essentially conceded his role in the drug-trafficking conspiracy.  Among other admissions, he admitted to negotiating the price of marijuana with a supplier for the organization and then providing the purchased marijuana to a co-conspirator.  Tomlinson likewise stated that he gave the marijuana supplier directions to where the co-conspirator was located so the supplier could then obtain payment for the marijuana sale.  In addition, Tomlinson admitted that he charged co-conspirator Harvey with various drug-related errands for both Tomlinson and Bushay.  Tomlinson also said that he agreed to transport drug proceeds on behalf of Bushay.

Yet during trial, Tomlinson's defense insisted in opening argument that Tomlinson was not involved in the conspiracy to distribute drugs and that he had only ever been involved in any way with drug distribution under coercion, when Mexican drug dealers in Arizona threatened to harm him if he refused.  This story was plainly contradicted by Tomlinson's proffer statement, in which he never so much as suggested that he had been coerced into dealing drugs and he, in fact, admitted his voluntary participation in the scheme.  Under the express terms of the proffer agreement, then, the Government was entitled to use Tomlinson's proffer statement as rebuttal evidence.

Nor, as Tomlinson suggests, did admission of Tomlinson's proffer statement violate Rule 410, Fed. R. Evid., or Rule 613, Fed. R. Evid.  With respect to Rule

410, the proffer agreement specifically provided that Tomlinson "waives any right to challenge the admissibility of [his proffer] statements or information under F.R.E. 410." And in the absence of any affirmative indication that Tomlinson entered the proffer agreement unknowingly or involuntarily, Tomlinson's waiver of Rule 410's protections is "valid and enforceable." *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995).

As for Rule 613, true, Rule 613(b) states that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." But Rule 613(b) further explains, "*This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).*" Fed. R. Evid. 613(b) (emphasis added). Tomlinson's statements during the proffer session, as testified to by a Government witness, were admissions of a party opponent under Rule 801(d)(2). *See United States v. Garmany*, 762 F.2d 929, 938 (11th Cir. 1985). In short, we find no error in the district court's admission of Tomlinson's proffer statement.

For the foregoing reasons, Tomlinson's conviction is affirmed.

**AFFIRMED.**